1ARMSTRONG, J.

STATEMENT OF CASE

On July 20, 1999, the defendant, Steven Rodrigue, was charged by bill of information with vehicular homicide in violation of La. R.S. 14:32.1 and perjury in violation of La. R.S. 14:12s.[1] The defendant entered a plea of not guilty at his arraignment on September 15, 1999. A preliminary and suppression hearing was held on October 27, 1999. The trial court found probable cause and denied defendant’s motions to suppress evidence and statements. After a two-day jury trial, the defendant was found guilty as charged on both counts on November 30, 1999. On February 2, 2000, the trial court sentenced defendant to serve fifteen years at hard labor without probation, parole or suspension of sentence on the charge of vehicular homicide and ten years at hard labor on the perjury charge. The trial court denied defendant’s motions for new trial and post verdict judgment of acquittal. Defendant waived all legal delays. On the same date, the State filed a multiple bill of information alleging defendant was a second felony offender. The | ^defendant pled not guilty to the multiple bill of information. A multiple bill hearing was held on February 17, 2000. At that hearing, the defendant withdrew his not guilty plea and admitted to the allegations in the multiple bill. The trial court adjudicated the defendant to be a second felony offender. The trial court granted the defendant’s motion to correct an illegal sentence and vacated the prior sentence imposed on the perjury charge. The trial court then sentenced the defendant to five years at hard labor on the perjury charge under the multiple offender statute. The trial court denied defen *731 dant’s motion to reconsider sentence. The defendant now appeals.

STATEMENT OF FACT

On July 16, 1997, Detective Steven Koch was assigned to investigate a fatality that occurred at Mistletoe and Earhart that evening. He received the call at approximately 9:25 p.m. When he arrived on the scene, the victim, Lennaire Alexis, and occupants of the other vehicle, Steven and Jamie Rodrigue, had been taken to the hospital. The victim’s vehicle, a 1995 Toyota Avalon, was straddling the concrete median at Mistletoe Street. The other vehicle, a 1987 Nissan, was in the eastbound lane with its rear end backed up against the concrete wall. The officer determined that the Toyota was traveling eastbound in the right travel lane and the Nissan was traveling in the opposite direction in the left lane. At some point, the Nissan struck the median, became airborne and came down on top of the Toyota. The vehicles separated and rotated. The officer called the crime lab to the scene. The crime lab took photographs of the scene and samples of the blood smears on the Nissan. There were blood smears on the outside quarter panel of the driver’s side door, on the passenger window, and on the ground at the rear of the Nissan. Detective Koch was notified by other officers that the victim had died. 1 aOne witness, George Griffith, approached the officer and told the officer that he had seen the accident. The officer spoke with Griffith that evening and obtained a statement. Griffith’s statement was not consistent with the officer’s findings as far as the direction of travel. However, other information received from Griffith was accurate. Griffith stated that the female in the Nissan exited from the passenger window. As he approached the Nissan, Griffith observed both the man and woman standing on the driver’s side of the Nissan. Griffith saw the woman throw a silver oblong object over the side of the bridge.
Upon examining the Nissan, Detective Koch noted that the passenger door was jammed shut. However, the passenger window was open. Based upon statements made by Jamie Rodrigue to other police officers, he prepared an arrest warrant for her. Jamie Rodrigue told the police officers at the hospital that she was the person driving the Nissan.
Detective Koch returned to the accident scene the day after the accident. When he arrived on the scene, he observed Jamie Rodrigue, dressed in a hospital gown, and a friend, looking over the side of the bridge. Jamie Rodrigue told Detective Koch that she was traveling westbound on Earhart in the left lane. She came upon an eighteen-wheeler in the left lane and moved into the right hand lane to pass the truck. However, there was another vehicle in front of the truck. She moved into the left lane in front of the truck. The truck struck her and her vehicle went out of control. At the time of impact, she was forced from the driver’s seat into the backseat. The officer cautioned Ms. Rodrigue that the physical evidence did not support her statement, as there was no damage to the rear end of the Nissan.
|4Sgt. Daniel Mack was notified of the accident at approximately 9:25 p.m. The accident occurred at approximately 9:10 p.m. When the officer arrived at the scene, he observed the two vehicles involved in the accident. The dark colored Toyota had been traveling eastbound into New Orleans and the driver’s side roof was crushed inward from the other vehicle. The Nissan had been traveling westbound into Jefferson Parish when it went airborne, crossed the concrete median, landed on top of the Toyota, and came to rest on the inbound lane of the Earhart Expressway. Sgt. Mack and Officer George Wich- *732 ser went to the hospital to ascertain the identities and conditions of the parties involved. Sgt. Mack met Steven Rodrigue at the hospital. The officer advised Ro-drigue of his rights and proceeded to take a statement from him when the officer heard a female telling Mr. Rodrigue to shut up. The female, later identified as Jamie Rodrigue, told the officer that she was driving the vehicle. Sgt. Mack accompanied Steven Rodrigue to the CAT scan department while Officer Wichser spoke with Jamie Rodrigue. Sgt. Mack noted that Steven Rodrigue had a strong odor of alcohol on his breath. Rodrigue consented to a blood test. Blood and urine samples were taken from Steven Rodrigue. These samples were later placed in the Central Property and Evidence Room to be processed by the crime lab. Sgt. Mack noted during his interview with Rodrigue that there was blood on his forehead and hands. Rodrigue stated that his wife was the driver of the vehicle. Blood and urine samples were also taken from Jamie Rodrigue.
Joseph Tafaro, a criminalist with the New Orleans Police Department Crime Lab, testified that he analyzed the blood samples taken from Steven and Jamie Ro-drigue. The defendant’s blood alcohol level was .07. Jamie’s blood alcohol level was .11. Dr. Leon Glass, a forensic toxicologist, analyzed the urine samples Ltaken from the defendant and his wife. The defendant’s urine sample was positive for temazepan. Jamie’s urine sample was positive for marijuana, codeine and oxazep-an.
George Griffith testified that on the evening of July 16, 1996, he had been at a lounge on the corner of the 2800 block of Cherry Street and Apricot Street. He was standing across the street from the bar talking with some friends when he heard a car near Hamilton and Earhart rattling its motor. The witness looked down the street to see what kind of car was making that noise. According to the witness, he could see the Earhart Expressway from his location. When he looked down the street, he did not see the car. He did see a truck and another car on the side of the truck at a traffic light. When the light changed and traffic started moving, the car came speeding up and tried to get around the truck. The car did not make it around the truck and struck another vehicle from the side. The other vehicle, the Toyota, flipped and hit the median. The first car, the Nissan, flipped over and landed on the other side of the bridge. The witness and three other men ran to the scene. There were two people in the Nissan. The man was in the driver’s seat and the woman was in the front passenger seat. The woman climbed out of the window on the passenger side of the car. She screamed at the witness and told him to get away. Griffith told the woman that he and his friends wanted to help. The man in the driver’s seat was unconscious. He was bleeding from the head. The woman pulled him out of the vehicle. The man then awoke. The man and the woman discussed what happened. The man told the woman to say that she was driving. Griffith and his friends then went to check on the driver of the other vehicle. He tried to open the door to the driver’s side but could not because the roof was smashed. The woman was not moving. The witness later learned from the | (¡emergency medical technician that the woman had died. Griffith told the police officers that the man was driving the Nissan. He also told the officers that he saw the woman throw a something over the side of the bridge.
Julie Golden testified that she is a forensic scientist with ReliaGene Technologies. ReliaGene is a private DNA analysis firm in New Orleans. The witness was accepted as an expert in the field of molecular *733 biology and forensic DNA analysis. Ms. Golden conducted DNA testing on the blood samples taken on from the Nissan. The tests revealed that the blood was from Steven Rodrigue.
Dr. William Newman, a pathologist with the Coroner’s office, performed an autopsy on the victim, Lennaire Alexis. Dr. Newman testified that the victim suffered multiple skull injuries. There was severe damage to the left side of the head consisting of lacerations and a depressed skull fracture. There was also damage to the brain and separation at the level of the cerebrum and the brain stem. There was a hinge fracture at the base of the skull. The witness also noted that the victim had multiple lacerations on both shoulders and forearms. The victim’s blood and urine samples were negative for alcohol and narcotics.
Lorraine Alexis, the victim’s mother, testified that the victim was thirty-four years of age at the time of her death and had a twelve-year son. On July of 1999, she went to put flowers at the scene of the accident. While she was there, a woman approached her and told her that she had seen the accident. The woman gave Ms. Alexis her name, address and phone number. Ms. Alexis gave this information to the prosecutor.
Jamie Rider, the defendant’s wife, testified that she was in the vehicle with the defendant at the time of the accident. Earlier that evening, Jamie had been driving the vehicle. However, she asked the defendant to drive because she had 17drunk two wine spritzers. The defendant’s brother was also in the car. On the way to defendant’s brother’s house, the defendant was speeding and sideswiped side mirrors with another vehicle. The matter was handled and both parties drove off. They then dropped the defendant’s brother off at his house. Jamie and the defendant then proceeded towards Jefferson Parish on the Earhart Expressway. The defendant had been drinking beer that day. Immediately prior to the accident, Jamie and the defendant were yelling at each other. Jamie saw a yellow light and told the defendant to slow down. Suddenly, she heard a big boom. She did not remember the rest of the accident. Jamie testified that she was in the passenger seat and had the passenger seat lowered in a reclining position. She did not recall people coming up to the vehicle after the accident. Nor did she remember getting herself and the defendant out of the vehicle. She remembered seeing the defendant lying on the bridge with his eyes closed. She slapped him to wake him up. She thought he was dead. Jamie did not remember telling the police at the scene that she was driving the vehicle.
Jamie testified that the day after the accident she returned to the accident scene with a neighbor. While they were looking around, a police officer arrived. She told the officer that she was driving the vehicle that night and was trying to determine how the accident occurred. The statement she gave the officer was completely opposite of what really happened. She told the officer she was driving the vehicle because she was afraid for the defendant and herself. The defendant had threatened her and told her to tell the police that she was driving the vehicle.
Jamie recalled her arrest and trial for the same offense. She stated that she eventually told the prosecutors and police officers that she was not driving the vehicle. The defendant testified against her at trial. Jamie admitted that she pled | sguilty to being an accessory after the fact. She acknowledged that the defendant had been drinking and was driving the vehicle at the time of the accident. She admitted that she had taken a Valium *734 earlier that day. She suffered scrapes and cuts to her face and forehead, and abrasions on her left shoulder blade as a result of the accident.
Matt Bonura, an accident reconstruc-tionist, testified on the defendant’s behalf. He testified that, after reviewing documents concerning the accident, photographs and the defendant and Jamie Ro-drigue’s medical records, he determined that Jamie Rodrigue was the person driving the vehicle at the time of the accident. He suggested .that Jamie Rodrigue’s injuries were consistent with being in the driver’s seat and striking the steering wheel at the time of the accident. He stated that the defendant’s injuries, specifically the knee injury, is consistent with a passenger hitting his knee on the dashboard. However, Mr. Bonura acknowledged that the defendant had a five-inch gash on the back of his head and the blood on the vehicle was on the driver’s side of the vehicle. He further admitted that he could not say that some of the injuries might not have occurred prior to the accident. His investigation occurred two and one-half years after the accident.
On the evening of July 16, 1997, Lake-sha Hayes was going to a restaurant called Barrow’s Catfish when she observed a man driving a Nissan trying to beat an eighteen-wheeler. The Nissan lost control and hit another vehicle driving on Earhart Expressway. The other vehicle hit a pole, and the Nissan landed on top of Earhart Expressway. The Nissan and the eighteen-wheeler were driving towards Jefferson Parish. The other vehicle, a Toyota being driven by a woman, was headed towards Orleans Parish. The Nissan crossed over and hit the Toyota. Ms. 18Hayes testified that she ran to the Toyota and asked the woman if she was okay. The woman did not respond. Ms. Hayes then ran to the other vehicle. A woman was in the passenger seat. The driver, a man, was unconscious and was bleeding from the head. The woman was slapping the man, trying to wake him. Both the man and the woman smelled of alcohol. Ms. Hayes stated that she asked the woman if they were all right. The woman said yes. Ms. Hayes then ran down Earhart and had someone call the police. Ms. Hayes stated that she stayed at the scene for a short time and then went to her grandmother’s house. She told her grandmother about the accident. Ms. Hayes did not speak with the police that night because she was upset and scared. Her grandmother told her that the police had come around the neighborhood looking for people who may have seen the accident. Two years after the accident, she was at Barrow’s Catfish when she saw some people putting flowers at the accident scene. She approached them and learned that one of them was the victim’s mother. She told woman that she had seen the accident and gave the woman her name, address and phone number. Ms. Hayes identified the defendant as the person she saw driving the Nissan at the time of the accident.
At trial, the court allowed the State to present the defendant’s testimony from Jamie Rodrigue’s trial. At that trial, the defendant testified that his wife was driving at the time of the accident. He acknowledged that prior to the accident, they had been arguing. He stated that Jamie told the police officers at the hospital that she was driving the vehicle. He never told Jamie to say that she was driving.
Officer Glen Gross testified that on the evening of July 16, 1997, he was traveling westbound on Earhart Expressway when he came upon the accident scene. The woman in the dark colored Toyota was slumped over the driver’s seat. |10She had very few signs of life. The officer called for an emergency medical unit and addi *735 tional assistance. When the EMS arrived, the officer went over to the other vehicle. A white male and a white female were standing next to the driver’s side. The female told the officer that she had been driving the vehicle. The officer did not interview any witnesses. He secured the scene until other officers arrived. The officer acknowledged that while he was the first police officer on the scene, he was not the first person on the scene. By the time he arrived, there were several people on the scene. He could not say who was actually driving the vehicle.

ERRORS PATENT

A review of the record for errors patent reveals an error in the defendant’s sentencing. La. R.S. 14:32.1 requires the imposition of a fine “not less than two thousand dollars nor more than fifteen thousand dollars” in addition to imprisonment at hard labor. The trial court failed to impose a fine on the defendant when it sentenced the defendant on the vehicular homicide conviction. However, on appeal this Court will not correct errors favorable to a defendant where the issue is not raised by the State. State v. Fraser, 484 So.2d 122 (La.1986).

ASSIGNMENT OF ERROR NUMBER 1

In his first assignment of error, the defendant contends that the trial court erred when it denied his motion to suppress evidence of the blood tests taken at Charity Hospital. The defendant argues that Sgt. Mack did not have reasonable cause to have the blood tests performed as Jamie Rodrigue admitted at the hospital that she was the driver of the vehicle.
A review of the suppression hearing and trial transcripts reveals that Sgt. Mack testified that the blood tests were ordered after the defendant voluntarily In consented to the blood tests. Sgt. Mack stated that the defendant had a strong odor of alcohol on his breath during the officer’s interview with him at Charity Hospital. The officer advised the defendant of his rights and the defendant voluntarily consented to the blood tests.
As the defendant voluntarily consented to the blood tests, this assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 2

In this assignment, the defendant argues that the trial court erroneously denied his motion for a continuance. The defendant was represented by the Loyola Law Clinic at trial. The two supervising attorneys were Darryl Derbigny and Judson Mitchell. After jury selection had begun, Mr. Derbigny learned that the victim had been a close friend’s fiancée. Mr. Derbigny sought a mistrial and appointment of new counsel because he felt that he could not adequately represent the defendant. The trial court denied Mr. Der-bigny’s requests. However, the trial court allowed Mr. Derbigny to withdraw. The trial court indicated that Judson Mitchell, the other supervising attorney, was available to continue representing the defendant. The defendant, through Mr. Mitchell, orally sought a continuance so the defense team could “regroup.” The trial court denied the continuance but granted the defendant a recess.
Under La.C.Cr. P. article 708, a continuance is “the postponement of a scheduled trial or hearing, and shall not be granted after the trial or hearing has commenced.” “A motion for continuance shall be in writing and shall allege specifically the grounds upon which it is based and, when made by a defendant, must be verified by his affidavit or that of his counsel.” La. C.Cr.P. article 707.
|19In the present case, defendant sought a continuance after jury selection had begun. According to La.C.Cr. P. article 761, *736 “a jury trial commences when the first prospective juror is called for examination.” As jury selection had begun at the time the motion for a continuance was sought, the trial court correctly denied the oral motion for a continuance.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 3

The defendant also suggests that the trial court imposed an unconstitutionally excessive sentence. The defendant contends that the sentence of fifteen years at hard labor without benefit of probation, parole or suspension of sentence is excessive.
Article 1, Section 20 of the Louisiana Constitution of 1974 provides that “No law shall subject any person ... to cruel, excessive or unusual punishment.”
A sentence within the statutory limit is constitutionally excessive if it is “grossly out of proportion to the severity of the crime” or is “nothing more than the purposeless imposition of pain and suffering.” State v. Caston, 477 So.2d 868 (La.App. 4 Cir.1985). Generally, a reviewing court must determine whether the trial judge adequately complied with the sentencing guidelines set forth in La.C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case. State v. Soco, 441 So.2d 719 (La.1983); State v. Quebedeaux, 424 So.2d 1009 (La.1982).
If adequate compliance with Article 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of his case, keeping in mind that maximum [ 13sentences should be reserved for the most egregious violators of the offense so charged. State v. Quebedeaux, supra; State v. Guajardo, 428 So.2d 468 (La.1983).
Prior to sentencing, the trial court conducted a sentencing hearing and heard testimony from the victim’s family, Jamie Rider’s family and the defendant’s family. In sentencing the defendant to fifteen years at hard labor, the trial court provided extensive reasons for the sentence imposed.
Mr. Rodrigue, step forward, please. In this particular case Steven Rodrigue has entered a plea of guilty to the charge of possession of cocaine. He was found guilty by a jury of the offense of vehicular homicide and perjury. The Court ordered a pre-sentence investigation into his background. The State has also informed the Court that they will file a multiple bill of information against him. I find from that, therefore, the defendant is not eligible to receive any suspended sentence or be placed on probation.
Also for the charge of vehicular homicide, under the laws of this state, he is not eligible to receive a suspended sentence or be placed on probation. Based on this pre-sentence report I cannot, in all good conscience, give you a suspended sentence or place you on probation even if you were eligible for such a sentence.
I note that this offense occurred in July of 1997. That is the date of this alleged offense. Not the alleged offense, the date of this offense. This vehicular homicide occurred in July of 1997. I also note from this record that you made bond on that vehicular homicide in July of 1997. I note from this pre-sentence report that you have — that you were arrested in October of 1997 for a burglary charge which took place in Jefferson Parish, a charge to which you were subsequently convicted. I also note in this that you were arrested and were convicted on at least one occasion — you were arrested for two *737 D.W.I.’s one which occurred on July 6, 1998. The other you made bond and on July 22, 1998 you were arrested again for a D.W.I. The second arrest ends in a conviction for D.W.I.
In August — excuse me — April of 1999 you were arrested and subsequently pled guilty to possession of cocaine. From July of 1997 until this very day you have been arrested on at least four occasions; three of those arrests ended in convictions. To say that you are sorry and to say that there is some remorse is very difficult for me to accept at this point, Mr. Rodrigue. There has been no showing from your point of view of any remorse.
You’re in jail right now. And I did not have anything to do with this case for almost two years, and I know that there has been concern about the delays that had gone on in this matter for almost two years. I did not have anything to do with that. This case was— this particular case was in this courtroom for a period of, I believe, less than six months. And you were |14remanded almost immediately because you walked into this courtroom with a positive cocaine reading in a urine test.
In my opinion, if you had been sincerely interested in doing anything that was right to try to help yourself, you would have done something while you were out there. You would have first of all not gotten into a car and continued to drive. You would have not been drinking. You would not have been involved in the drugs. You would have not been involved in the other acts, the other criminal acts.
You see, a lot of these people in the courtroom today from the victim’s point of view — although you have said you did not intend to hurt anyone, I agree with that. It was not murder in the sense of you going out and intentionally wishing to kill or inflict great bodily harm on someone. But a lot of people feel that when you get behind the wheel of an automobile and you’re in an intoxicated state, that’s almost as bad as a person who goes out on the streets of the this city and starts shooting a gun at other human beings, because you’re not in full control. Not only when you sort of go to the mountaintop because of drinking and narcotics and then you continue to get behind the wheel of a car and continue to drive and continue to drink and continue to use narcotics, it is very difficult for me to say that there is any remorse on your point — from your point of view with regard to this incident.
The thing that also sticks in my craw about this case is that there was an effort from the almost get-go, immediate get-go, to place the blame on the co-defendant, a co-defendant. From the moment you got out of the car there had been reports — and from the moment you all were in the hospital there were reports about how you said, Take the fall for this. Take the blame for this. Don’t let me take the fall for this.
When I look at your record, I don’t understand why it is you’re pushing the blame on her. Because you had no significant criminal history up to his point. You had some arrests. The worst thing it looks like was a marijuana conviction back in 1997, which was prior to this. There were a few — criminal damage, theft, a number of arrests. But it doesn’t look like there were significant or serious convictions up to this point.
Your attempt, not only from the moment that you got out of the car to try to cover up and hide it, but then you walked into a courtroom, you walked into this — our system of justice so to speak. And you attempted to do a com- *738 píete, a total slap in the face to the system of justice by getting on the witness stand and lying at a prior proceeding.
It is very difficult, as I said, for me to sit here this morning and to have any sympathy or any remorse for you when you have done absolutely nothing, absolutely nothing, up to this point in this proceeding to try to show me or demonstrate to me that you are truly sorry for these actions.
As can be seen from the above-quoted reasons, the trial court recognized that the defendant continued to engage in criminal activity after the vehicular accident. Within only a few months of the accident, the defendant was arrested for, and later | ^convicted of, burglary in Jefferson Parish. In addition, the defendant was arrested twice for D.W.I. One of these arrests resulted in a conviction in 1998. Then, in April of 1999, the defendant was arrested for possession of cocaine. The defendant subsequently pled guilty to the possession of cocaine charge. The defendant’s continued criminal involvement, especially his behavior of driving while intoxicated, and his attempt to have his wife take responsibility for his actions, also suggest a lack of remorse for his actions.
Given the defendant’s criminal history and his apparent lack of remorse, the sentence of fifteen years at hard labor, without benefit of probation, parole or suspension of sentence, is not unconstitutionally excessive.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 4

In his last assignment, the defendant contends that the trial court erroneously allowed his blood tests to be admitted into evidence. The defendant argues that the State failed to meet its burden of proof to show that the blood was taken and analyzed by persons who had the requisite qualifications and that the state complied with the promulgated procedures.
A review of the trial transcript reveals that the defendant did not object when the State sought to introduce the results of the blood tests into evidence. Further, the transcript of the suppression hearing indicates that the defendant’s argument for suppression of the blood tests results was based upon whether the police officers had a reasonable belief that the defendant was intoxicated. Thus, as the defendant did not object at trial and defendant’s basis for argument on appeal is different from the argument presented at the suppression hearing, this issue has not been preserved for appellate review. La. C.Cr. P. article 841.
|1fiFor the foregoing reasons, the defendant’s conviction and sentence are affirmed.

AFFIRMED.

. Initially, the defendant’s wife, Jamie Rider . a.k.a. Jamie Rodrigue, was charged with the vehicular homicide. After her trial ended in a mistrial, new evidence revealed that the defendant was the driver of the vehicle. The present bill of information was filed against the defendant. Jamie Rider was then charged with being an accessory after the fact. She initially pled not guilty but withdrew her not guilty plea and pled guilty as charged on October 27, 1999. On February 2, 2000, the trial court sentenced her to serve five years at hard labor, suspended the sentence and placed her on active and supervised probation for five years. The court also sentenced her to two years in the parish jail and set special conditions for probation.